UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| INELLE L. GREEN,<br><br>Plaintiff,<br><br>v.<br><br>NANCY BERRYHILL,<br><br>Defendant. | Case No. 17-cv-06637-LB<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE**<br><br>Re: ECF Nos. 28 & 29 |

## INTRODUCTION

Plaintiff Inelle Green seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] She moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to

---

[1] Motion for Summary Judgment – ECF No. 28 at 1–2. Record citations refer to the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 1.

[3] Cross-Mot. – ECF No. 29.

magistrate-judge jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On February 26, 2014, Ms. Green, born on November 14, 1962, and then age 51, filed claims for social-security disability insurance ("SSDI") benefits under Title II of the Social Security Act[5] ("SSA") and supplemental security income ("SSI") under Title XVI.[6] She alleged degenerative disc disease, arthritis in the left hip, Type II diabetes, microbacteria, colitis, sleep apnea, and bladder problems.[7] She alleged an onset date of January 9, 2013.[8] The Commissioner denied her SSDI and SSI claims initially and on reconsideration.[9] Ms. Green timely requested a hearing.[10]

On November 16, 2016, Administrative Law Judge Phillip C. Lyman (the "ALJ") held a hearing in San Jose, California.[11] Attorney Sonya Arellano represented Ms. Green.[12] The ALJ heard testimony from Ms. Green, vocational expert ("VE") Ronald Morrell, and medical expert ("ME") Subramaniam Krishnamurthi, M.D.[13] On December 13, 2016, the ALJ issued an unfavorable decision.[14] Ms. Green timely appealed the decision to the Appeals Council on

---

[4] Consent Forms – ECF Nos. 14, 16.

[5] AR 233–36. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[6] AR 237–42.

[7] *See* AR 135–36.

[8] *See* AR 233, 237.

[9] AR 135–39; AR 143–48.

[10] *See* AR 150.

[11] *See* AR 32–63.

[12] AR 32.

[13] AR 32.

[14] AR 12.

February 15, 2017.[15] The Appeals Council denied her request for review on September 19, 2017.[16] On November 17, 2017, Ms. Green timely filed this action for judicial review[17] and subsequently moved for summary judgment on July 6, 2018.[18] The Commissioner opposed the motion and filed a cross-motion for summary judgment on August 3, 2018.[19] Ms. Green filed a reply on September 17, 2018.[20]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Hartford Central — Treating

Ms. Green was treated on multiple occasions at Hartford Central from January 11, 2013 through April 23, 2013 in connection with a worksite injury.[21] Ms. Green was diagnosed with a sprain and contusion of her left hand and carpal tunnel syndrome.[22] Ms. Green was prescribed to wear a splint[23] and to undergo physical therapy.[24] Over the course of her visits, her left-hand pain decreased significantly and her injury improved.[25] As of February 25, 2013, Ms. Green was advised to return to work "without restrictions[,]"[26] and as of April 16, 2013, she was performing "regular job duties."[27] Ms. Green reported that her condition improved with physical therapy, and

---

[15] *See* AR 5.

[16] AR 1–6.

[17] Complaint – ECF No. 1 at 1–2.

[18] Mot. – ECF No. 28.

[19] Cross-Mot. – ECF No. 29.

[20] Reply – ECF No. 32.

[21] AR 374–456.

[22] *See, e.g.*, AR 389, 494–96.

[23] *See, e.g.*, AR 471.

[24] *See, e.g.*, AR 389.

[25] *See, e.g.*, AR 470.

[26] AR 401.

[27] AR 387.

as of April 23, 2013, Ms. Green was released from care "without ratable disability or need for future medical care."[28] She further reported that she did not lose any work time as a result of her injury.[29]

The records reflect Ms. Green's morbid obesity: for example, as of January 21, 2013, Ms. Green was 5'6" and weighed 272 pounds.[30] The records also note Ms. Green's medical history of diabetes, tendonitis, carpal tunnel syndrome, and degenerative disc disease.[31] At the time, she was also undergoing treatment for the following conditions: hypertension, pedal or pretibial edema, asthma, recurrent urinary tract infections, back pain, depression, insomnia, and urinary frequency.[32]

### 2.1.2    Santa Clara Valley Medical Center — Treating

Ms. Green was treated on multiple occasions from February 4, 2013 through April 16, 2016 at the Santa Clara Valley Medical System.[33]

On July 10, 2013, Ms. Green underwent phase one of surgery for the placement of a sacral-nerve stimulator wire and electrode to alleviate her urinary frequency and urge incontinence.[34] There were no complications.[35] During a follow-up appointment on July 18, 2013, Ms. Green stated she may have "yanked the lead out" following her surgery but otherwise her condition had improved.[36] After the surgery, Ms. Green felt she had sufficient time to get to the bathroom and she was no longer leaking, whereas before her surgery, she leaked at least twice per day.[37] On July

---

[28] AR 376.

[29] AR 374.

[30] *See* AR 511.

[31] *See, e.g.*, AR 387, 399, 494.

[32] *See, e.g.*, AR 375, 388, 400, 470, 495.

[33] *See* AR 528, 735–801, 836–1031.

[34] AR 592–95.

[35] AR 594.

[36] AR 595.

[37] *Id.*

24, 2013, Ms. Green underwent phase two of surgery for programming of the sacral-nerve stimulator and implantation of a left-sided pulse generator.[38]

On July 31, 2013, Michael Jones, M.D., an emergency-medicine specialist, saw Ms. Green for back pain.[39] Ms. Green reported that when she was getting out of her car, she had an "acute onset" of pain in the right back and right flank that worsened with movement.[40] Dr. Jones noted that Ms. Green had a "possible post operative hematoma/seroma" although her wound appeared clean, dry, and intact.[41] He prescribed Ms. Green pain medication.[42] Ms. Green also reported that her left-hip pain had improved since her procedures for incontinence.[43]

During follow-up visits, urology resident Janet Lee reported that the surgery had improved Ms. Green's leakage, but she continued to experience urge upon standing up.[44] As of October 15, 2013, Ms. Green was back to wearing approximately one to two pads per day, which were moist but not soaked.[45] Ms. Green experienced intermittent tailbone pain following her surgery, and she felt that her arthritis was worsening in her hips.[46]

On October 17, 2013, Frank Kagawa, M.D., an internist, consulted Ms. Green regarding her obstructive sleep apnea.[47] Dr. Kagawa noted that Ms. Green's sleep is disrupted frequently throughout the night "[u]sually due to pain, or because of bladder[.]"[48] He also noted Ms. Green

---

[38] AR 599.

[39] AR 604.

[40] *Id.*

[41] AR 606.

[42] AR 607.

[43] AR 604.

[44] AR 528.

[45] *Id.*

[46] AR 527–28.

[47] AR 530.

[48] *Id.*

had chronic hip and back pain,[49] needed to walk with a cane,[50] and needed to sleep in her car during the workday to rest her hip and back, and to catch up on sleep.[51] Ms. Green requested portable oxygen for daytime use when she napped in her car.[52] Dr. Kagawa recommended that Ms. Green continue BiPAP (bilevel positive airway pressure) therapy and encouraged her to lose weight.[53]

Umaima Marvi, M.D., a rheumatologist, saw Ms. Green for an initial consultation for hip pain on December 17, 2013.[54] Ms. Green stated that her hip pain began two years prior and that it was "constant[.]"[55] A steroid shot in her tailbone did not help.[56] Ms. Green further stated that her pain was worse when in bed and when moving from sitting to standing.[57] She lived on the second floor of her building and would have to take one step at a time.[58] She experienced approximately ten minutes of stiffness each morning.[59] Dr. Marvi noted that Ms. Green was not taking any medication for her hip pain because Ms. Green was already taking many drugs for her other conditions (including diabetes, hypertension, high cholesterol, overactive bladder, and microscopic colitis).[60] Ms. Green infrequently took ibuprofen and tried to work through the pain.[61] She could walk only approximately ten to fifteen feet without a cane and, as of December 17, 2013, she had not been to physical therapy.[62] Dr. Marvi recommended that Ms. Green take 1000

---

[49] AR 533.

[50] AR 530.

[51] *Id.*

[52] *Id.*

[53] AR 533.

[54] AR 538.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

mg of Tylenol every day, referred her to physical therapy, and noted that she would complete Ms. Green's disability paperwork.[63] A December 18, 2013 left-hip x-ray showed that Ms. Green had moderate to severe degenerative changes of the left-hip joint.[64]

On February 19, 2014, Ms. Green was admitted to Santa Clara Valley Medical Center for chest pain.[65] Ms. Green stated that her pain was severe but had no shortness of breath, diaphoresis, or other complaints.[66] On that same day, Ms. Green had just completed a course of Doxycycline and Prednisone, prescribed for asthmatic bronchitis.[67] Michael McCarthy, M.D., an internist, opined that Ms. Green's pain likely resulted from her recent bronchitis exacerbation.[68] She was discharged on February 20, 2014,[69] and as of February 26, 2014, though not completely resolved, her pain had improved.[70]

During a follow-up examination, Dr. Michael Jones noted that Ms. Green quit her job at a private school (Stratford School) due to "right hip pain[,]"[71] which made walking difficult for her.[72] He also noted that Ms. Green ambulated with a cane and needed a cane to climb stairs.[73]

On April 4, 2014, Dr. Marvi saw Ms. Green for a follow-up regarding her left "hip OA[.]"[74] Ms. Green's hip pain was "still significant," she could only walk for ten minutes with her cane, and her gait was "very antalgic."[75] Ms. Green took Tylenol for the pain, but Tylenol made her

---

[63] AR 543.

[64] AR 775.

[65] AR 550–64.

[66] AR 562.

[67] *Id.*

[68] *Id.*

[69] *See* AR 565.

[70] *See* AR 567.

[71] AR 558.

[72] AR 559.

[73] AR 558.

[74] AR 664.

[75] *Id.*

sleep.[76] At that time, she worked as a nanny and drove during the day, so she did not want to take medication that made her sleepy or groggy.[77] Ms. Green also felt that Vicodin and Codeine were ineffective because she had developed a tolerance to those medications.[78] Dr. Marvi noted that Ms. Green's left-hip x-ray from December 2013 showed moderate to severe osteoarthritis[79] and that Ms. Green's condition had progressed since 2011[80] and worsened since her last evaluation.[81] Dr. Marvi also noted that Ms. Green had not yet gone to physical therapy.[82] Dr. Marvi again referred Ms. Green to physical therapy, referred her to orthopedics, and discussed the need for Ms. Green to lose weight.[83] On May 19, 2014, Alvaro Davila, M.D., an endocrinologist, noted that Ms. Green's chronic back pain and "severe left hip OA" would require a hip implant that year.[84]

On June 5, 2014, Ms. Green reported consistent "lock in key" leakage due to urinary incontinence but said that her condition had improved since receiving the sacral-nerve implant.[85]

During a physical-therapy evaluation on June 6, 2014, Ms. Green reported that her left leg started "giving out" in about October 2012.[86] She stated that after leaving her job in 2013, her pain had decreased because she was not standing as frequently.[87] She also started to have trouble with sustained positions.[88] She further reported that she would need to have hip-replacement surgery but had to first undergo physical therapy.[89] Physical therapist Deborah Chatfield noted the

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] AR 664; *see also* AR 775.

[80] AR 668.

[81] AR 664.

[82] *Id.*

[83] AR 668.

[84] AR 673–74.

[85] AR 678.

[86] AR 696.

[87] *Id.*

[88] *Id.*

[89] *Id.*

following functional limitations: (1) standing for ten minutes; (2) sitting for fifteen minutes; (3) walking for ten to fifteen minutes; and (4) difficulty with donning and doffing shoes, and sometimes pants.[90]

On June 16, 2014, Ms. Green visited the Santa Clara Medical Center's orthopedic clinic for left-hip osteoarthritis.[91] Physician Assistant Jeffrey Young noted that Ms. Green's left-groin pain had been worsening for two years, she walked with a cane, and she weighed approximately 300 pounds.[92] He noted that she was undergoing physical therapy at that time and that she was "trying again" to get on the waiting list for gastric-bypass surgery.[93] He advised that Ms. Green return in six months for a left-hip x-ray.[94]

On June 17, 2014, Lynn Ngo, M.D., an internist, saw Ms. Green for hip pain.[95] Dr. Ngo noted that orthopedics recommended weight loss of at least 50 pounds before Ms. Green could undergo hip-replacement surgery.[96] Ms. Green was evaluated for gastric-bypass surgery, but she missed a class that was mandatory for the surgery.[97] Ms. Green complained that her physicians did not do anything in the clinic to get her the surgery.[98] She promised that she would attend the next gastric-bypass surgery class.[99]

Ms. Green began a pool exercise program in July 2014.[100] On September 15, 2014, Ms. Green reported that she was swimming with a personal trainer approximately six days per week.[101] She

---

[90] AR 697–98.

[91] AR 579.

[92] Id.

[93] Id.

[94] AR 583.

[95] AR 709.

[96] Id.

[97] Id.

[98] Id.

[99] Id.

[100] AR 719.

[101] AR 838.

lost about ten pounds as a result and was watching her diet.[102] She attended the mandatory orientation for gastric-bypass surgery.[103] She used a walker and was "not so stable" with a cane.[104] She reported that her right hip pain was worse.[105]

On November 9, 2015, Ms. Green attended physical therapy following a referral by her primary care physician, Bernette Tsai, M.D, an internist.[106] At that time, Ms. Green reported that she lived with a full-time caregiver and could not clean her house.[107] Physical therapist Dawn Asano noted Ms. Green's functional limitations as follows: (1) walking for ten minutes at a time and (2) sitting for fifteen minutes at a time.[108] During a follow-up therapy session, she noted that Ms. Green could no longer afford to go to the pool for exercise.[109] She also noted that, during gait training, Ms. Green was "teary eyed/crying [] regarding her hip pain[.]"[110]

On December 10, 2015, nurse practitioner ("NP") Debra Rivas saw Ms. Green for obstructive sleep apnea.[111] NP Rivas noted that Ms. Green's weight had increased by 28 pounds over the last six months.[112] She also noted that a prior sleep study indicated that Ms. Green had severe sleep apnea with severe oxygen desaturations.[113] Ms. Green had not been compliant with CPAP (continuous positive airways pressure)/BiPAP use because she reported falling asleep easily and

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] AR 965–77; *see also* AR 701–19.

[107] AR 969.

[108] *Id.*

[109] AR 975.

[110] AR 719.

[111] AR 1000.

[112] AR 1001.

[113] *Id.*

did not think it was necessary.[114] NP Rivas recommended that Ms. Green continue with

CPAP/BiPAP machine use.[115]

That same day, Payam Tabrizi, M.D., an orthopedic surgeon, consulted Ms. Green regarding

her hip pain.[116] Dr. Tabrizi noted that bursitis injections were not helpful and that Ms. Green had

not succeeded in losing weight.[117] He also noted that Ms. Green had completed her preparation for

gastric-bypass surgery and was on the wait list for same.[118] He reported that Ms. Green quit

working a year prior "due to right hip pain" and that she ambulated with a cane.[119]

### 2.1.3    Bernette Tsai, M.D. — Treating Physician[120]

Dr. Tsai — addressed by the ALJ because she did a residual functional capacity ("RFC")

assessment — saw Ms. Green on at least fifteen occasions from May 20, 2013 through May 17,

2016.[121] The records reflect Ms. Green's height and weight of 5'6" and 293 pounds.[122] Dr. Tsai

listed Ms. Green's active and chronic problems (including diabetes "without mention of

complication, not stated as uncontrolled[,]" hyperlipidemia, hypertension, obstructive sleep apnea,

ulcerative colitis, obesity, asthma, lumbago, depressive disorder, positive PPD, osteoarthritis,

frequent kidney stones, and urge incontinence), and reviewed her medical history (including Ms.

Green's active medications, allergies, and family medical history).[123] Dr. Tsai treated Ms. Green

---

[114] *Id.*

[115] *Id.*; *see also* AR 1050–51.

[116] AR 1003.

[117] *Id.*

[118] *Id.*

[119] AR 1004.

[120] Dr. Tsai also treated Ms. Green at the Santa Clara Valley Medical Center.

[121] *See* AR 514–17, 520–27, 565–68, 588–91, 600–04, 611–20, 831–35 (duplicate December 17, 2013 report), 844–47, 851–54, 865–67, 869–75, 879–82, 933, 936–42, 1025–28, 1032–35, 1059–62, 1069–72.

[122] *See* AR 566.

[123] *See, e.g.*, AR 520–21, 523.

for various ailments, including diabetes, hypertension, obstructive sleep apnea, hip pain, and back pain.[124]

During a May 20, 2013 visit, Dr. Tsai treated Ms. Green for obstructive sleep apnea and left-hip pain, among other treatments.[125] With respect to sleep apnea, Dr. Tsai noted that Ms. Green used BiPAP nightly but often took it off because she had difficulty breathing while using it. Ms. Green felt tired often.[126] Dr. Tsai noted that Ms. Green did not meet the criteria for oxygen.[127] In regard to her left-hip pain, Dr. Tsai treated it with an injection into the greater trochanter and noted that it was likely caused by trochanteric bursitis.[128]

On July 29, 2013, five days after Ms. Green's second surgery for incontinence, Dr. Tsai saw Ms. Green for left-hip pain.[129] Ms. Green's pain "flared up along with some low back pain" after the device was implanted "somewhere in [the] lower back."[130] Dr. Tsai noted that the injection into Ms. Green's greater trochanter "didn't help" and that it was painful for Ms. Green to climb stairs.[131] She also noted that Ms. Green's pain may have flared up due to her recent surgeries.[132] Dr. Tsai recommended that Ms. Green continue with her exercise and weight loss plan.[133]

---

[124] *See, e.g.*, AR 520–21, 589–91.

[125] AR 590.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] AR 600.

[130] *Id.*

[131] AR 603; *see also* AR 1017 ("[Ms. Green] had trochanteric injections by her PCP 2–3 times in the past, which did not help much.").

[132] AR 603.

[133] *Id.*

On August 14, 2013, Dr. Tsai noted that Ms. Green's low-back pain likely resulted from a kidney stone.[134] A CT scan showed "possible evidence of passed stone[.]"[135] Ms. Green was advised to stop Flomax medication, as stone had likely passed.[136]

For Ms. Green's back pain — "possible left sacroiliitis" — Dr. Tsai recommended that Ms. Green use Lidoderm ointment and reduce ibuprofen usage to once every two to three days.[137]

During an August 28, 2013 physical, Dr. Tsai reported that Ms. Green had no tenderness over the lumbar spine or sacral area and normal internal and external range of motion of the left hip.[138] She also reported that Ms. Green's incontinence had improved since her latest surgery.[139]

On October 9, 2013, Dr. Tsai again saw Ms. Green for hip problems.[140] Dr. Tsai noted two instances in which Ms. Green fell backwards while trying to get up from a chair.[141] Ms. Green had not experienced dizziness or imbalance but felt like "momentum pushe[d] her backwards."[142] Dr. Tsai also noted that it was harder for Ms. Green to get up from a sitting position on the floor.[143] Ms. Green's weight had increased from August 2013 to October 2013.[144] Although she tried to improve her diet and walk for exercise, she felt limited by hip pain and continued to drink soda.[145] Ms. Green said she would consider maintaining a food diary.[146] Dr. Tsai discussed with Ms. Green the option of weight loss to help with her hip pain.[147] Dr. Tsai also informed Ms. Green that she

---

[134] AR 611.

[135] AR 612.

[136] *Id.*

[137] AR 524.

[138] AR 523.

[139] AR 524.

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.*; *see also* AR 527.

[146] AR 527.

[147] *Id.*

does not do functional capacity evaluation forms for disability and advised Ms. Green to take the forms elsewhere.[148]

In a fill-in form dated December 17, 2013, Dr. Tsai diagnosed Ms. Green with "L hip OA" (left-hip osteoarthritis).[149] Dr. Tsai reported that Ms. Green experienced left-hip pain, stiffness, limited mobility, and that she was unable to walk more than two to three minutes due to pain.[150] Dr. Tsai cited her clinical findings as a hip x-ray and "moderate OA[.]"[151] From a list of twelve psychological conditions, Dr. Tsai reported that Ms. Green experienced one psychological condition — sleep disturbance — as a result of her pain.[152] Ms. Green's symptoms also "[o]ccasionally" interfered with the attention and concentration needed to perform "simple work tasks[.]"[153] Dr. Tsai also reported the following functional limitations resulting from Ms. Green's pain: (1) walking less than one block without rest or severe pain; (2) sitting for only thirty minutes at a time; (3) standing for five to ten minutes at a time; (4) walking around for five minutes every thirty minutes during an eight-hour workday; (5) taking four to five unscheduled breaks per day during an eight-hour workday; (6) using a cane or other assistive device; (7) never lifting more than ten pounds and only occasionally lifting less than ten pounds; (8) never squatting, never climbing stairs or ladders, and only rarely twisting and bending; and (9) likely being absent from work more than four days per month.[154] Dr. Tsai further reported that Ms. Green did not need to elevate her legs with prolonged sitting.[155] According to Dr. Tsai, Ms. Green's limitations first began two years preceding her December 17, 2013 report.[156]

---

[148] *Id.*

[149] AR 832.

[150] *Id.*

[151] *Id.*

[152] AR 833.

[153] *Id.*

[154] AR 833–35.

[155] AR 834.

[156] AR 835.

On February 26, 2014, Dr. Tsai saw Ms. Green for worsening left-hip pain — "some pins and needles sensation in left toes" — and an employment development department ("EDD") form.[157] The "pins and needles" sensation occurred randomly, especially at night, and only in Ms. Green's left toes.[158] Dr. Tsai noted that Ms. Green's left-hip osteoarthritis appeared on an x-ray.[159] She also noted Ms. Green's limping and that she had a normal range of motion in her left hip but pain with internal and external rotation of that hip.[160] Ms. Green had no tenderness in the lumbar spine or left SI joint.[161]

Ms. Green had started to use a walker with a seat in it and could still only walk for approximately ten to fifteen minutes at a time before needing to sit due to pain in the left hip.[162] Dr. Tsai also noted that sitting or lying down helped with the pain.[163] Ms. Green took 1000 mg of Tylenol for her pain but such medication made her sleepy.[164]

On September 29, 2014, Dr. Tsai saw Ms. Green for diabetes and hip pain.[165] Dr. Tsai noted that Ms. Green swam for exercise approximately two hours per day, six days per week.[166] Ms. Green fell at the pool the week prior because she lost her balance.[167] Ms. Green reported that she was falling more frequently because if she lost her balance, she could not catch herself due to left-hip pain.[168] She also reported that she could not walk or stand on her left hip for more than five

---

[157] AR 565.

[158] *Id.*

[159] AR 566.

[160] AR 567.

[161] *Id.*

[162] AR 565.

[163] *Id.*

[164] *Id.*

[165] AR 844.

[166] *Id.*

[167] *Id.*

[168] *Id.*

minutes and that she felt pain in her right hip as well.[169] Ms. Green used a walker and cane, could

not go upstairs, and had trouble carrying heavier items such as trash.[170] Dr. Tsai noted that Ms.

Green was on the wait list for a hip replacement.[171] Dr. Tsai recommended that Ms. Green use

Lidoderm gel during the day and switch from Tramadol to Tylenol at night to control her pain.[172]

Dr. Tsai also submitted paperwork to the housing authority verifying Ms. Green's need for

reasonable accommodation of her limited mobility due to hip pain.[173]

In a medical-source statement dated January 21, 2015, Dr. Tsai documented the following

changes in Ms. Green's medical conditions: Ms. Green's left-hip pain continued to worsen,

causing significant mobility issues and falls due to loss of balance.[174] A December 18, 2013 left-

hip x-ray showed "moderate to severe degenerative changes in the left hip[,]" and an April 4, 2014

evaluation by rheumatologist Dr. Marvi concluded that Ms. Green's left-hip arthritis had

progressed since 2011.[175] Dr. Tsai also reported that Ms. Green was evaluated by an orthopedic

surgeon for "total hip arthroplasty" and was placed on a waiting list for that procedure.[176] She had

recently lost a "significant amount of weight" (more than fifteen pounds) in preparation for a left-

hip arthroplasty.[177] Ms. Green also developed right hip pain, and another x-ray showed mild

arthritis in the right hip.[178] Finally, Ms. Green could not stand or walk for more than five to ten

minutes at a time or sit still for more than twenty to thirty minutes at a time. She also needed to

---

[169] *Id.*

[170] *Id.*

[171] AR 847.

[172] *Id.*

[173] *Id.*

[174] AR 831.

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.*

elevate her legs periodically while sitting, to hip level for approximately fifty percent of the time.[179]

On February 20, 2015, Dr. Tsai again saw Ms. Green for hip pain.[180] Ms. Green reported having "spasms" in her right thigh, mainly at nighttime.[181] She also reported that she put most of her weight on her right leg due to left-hip pain.[182] Dr. Tsai noted that Ms. Green's right-thigh pain likely resulted from overuse of her right leg due to left-hip pain.[183] Dr. Tsai recommended that Ms. Green try Baclofen, continue to take Tylenol at bedtime, and use a Lidoderm patch for pain control.[184] On August 8, 2015, Dr. Tsai noted that the Lidoderm patch helped with Ms. Green's hip pain.[185]

On August 12, 2015, Dr. Tsai saw Ms. Green for a medication refill and hip pain.[186] Ms. Green reported daytime somnolence but said that she did not feel sleepy if she skipped her morning medications.[187]

On January 13, 2016, Dr. Tsai saw Ms. Green for hip pain.[188] Ms. Green reported that she was "very stressed" the prior weekend regarding her finances and "wanted to give up."[189] Ms. Green had thoughts of suicide but did not get to the point where she came up with a plan.[190] She reported no longer having suicidal thoughts after speaking to a friend and former therapist.[191] Ms. Green

---

[179] Id.

[180] AR 865.

[181] Id.

[182] Id.

[183] AR 867.

[184] Id.

[185] AR 872.

[186] AR 936.

[187] Id.

[188] AR 1025.

[189] Id.

[190] Id.

[191] Id.

stated that she was frustrated because she could not improve her health or financial situation.[192]
She reported that chronic pain in her hips, back, and arms made her feel depressed.[193] Ms. Green
stated that she had a history of nine suicide attempts "many years ago" by overdosing and abusing
alcohol.[194] She reported improvement in her sleep with a new sleep machine and less daytime
sleepiness.[195] Dr. Tsai referred Ms. Green to counseling and recommended antidepressants.[196] Dr.
Tsai also noted that Ms. Green's chronic pain was likely due to osteoarthritis and obesity.[197]

As of February 11, 2016, Dr. Tsai reported that Ms. Green's mood was "more stable" and that
she denied feeling episodes of depression since her appointments a few weeks prior.[198] Dr. Tsai
saw Ms. Green again on April 11, 2016.[199] Ms. Green reported that she had recently gotten a dog,
which helped with her anxiety and mood and forced her to get out of the house and walk.[200]

### 2.1.4 Maria Antoinette, Psy.D. — Examining

On May 23, 2014, Dr. Antoinette, a psychologist, examined Ms. Green at the request of the
SSA for disability determination purposes.[201] The records reflect Ms. Green's height and weight as
5'6" and 303 pounds.[202] Dr. Antoinette considered Ms. Green's chief complaints (depression,
degenerative disc disease, arthritis of the left hip, and diabetes) and reviewed the following: Ms.
Green's medications; her history of past and present illness (depression since childhood); her

---

[192] *Id.*

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] AR 1027.

[197] AR 1028.

[198] AR 1032.

[199] AR 1059.

[200] *Id.*

[201] AR 574–76.

[202] AR 574.

social history (no psychiatric problems but traumatic childhood); and her employment history (including last job at Stratford School one year earlier).[203]

In regard to her level of functioning, Ms. Green stated that she was capable of performing her personal grooming and hygiene and that she did household chores such as cooking, cleaning, and laundry.[204] Dr. Antoinette observed that Ms. Green had good grooming and hygiene, was not in any form of physical distress, ambulated with the aid of a crane, and was obese.[205] Dr. Antoinette noted that Ms. Green was coherent and that she denied having hallucinations or suicidal or homicidal ideation.[206] She also noted that Ms. Green was mildly depressed "with inappropriate affect."[207] Dr. Antoinette's medical-source statement also reflected the following unimpaired abilities, among others: (1) able to relate to others in an appropriate manner; (2) able to follow complex, detailed instructions; (3) able to maintain appropriate level of concentration to perform simple tasks; (4) able to tolerate normal daily stress and pressures; and (5) capable of managing funds.[208]

### 2.1.5    Roger Fast, M.D. — Examining

Dr. Roger Fast examined Ms. Green on April 16, 2014.[209] He opined as follows: Ms. Green could occasionally lift and carry twenty pounds and frequently carry ten pounds, and she could stand or walk for four hours and sit for six hours in an eight-hour workday.[210] In considering her limping gait, pain and tenderness in the left hip, and obesity, Dr. Fast opined that Ms. Green had a "narrow light" RFC.[211]

---

[203] *Id.*

[204] AR 575.

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] AR 576.

[209] AR 89–90.

[210] AR 89.

[211] AR 90.

### 2.1.6    A. Nasrabadi, M.D. — Non-Examining

On September 17, 2014, Dr. Nasrabadi opined as follows: Ms. Green could occasionally lift and carry twenty pounds and frequently carry ten pounds, and she could stand or walk for four hours and sit for six hours in an eight-hour workday.[212] Dr. Nasrabadi reported that, based on Ms. Green's obesity, her reports of hip pain and lumbago were credible.[213] In considering her limping gait, pain and tenderness in the left hip, and obesity, Dr. Nasrabadi opined that Ms. Green had a "narrow light" RFC.[214]

## 2.2    Other Opinion Records

### 2.2.1    Andrea Black

Ms. Green's friend of fourteen years, Andrea Black, submitted a third-party function report in support of Ms. Green's disability claims.[215] Ms. Black reported that she spent time with Ms. Green "once to two times a week" during which time they "[watched] movies, shopp[ed], [hung] around house[.]"[216] Ms. Black reported that Ms. Green was "[u]nable to walk a block" and "[u]nable to shop at Ikea[,]" and that for Ms. Green, it was "[h]ard to get up off the ground/floor[.]"[217] Ms. Black also reported that Ms. Green "[f]eeds & changes litter box" for Ms. Green's pet but that "[b]ending down and lifting is difficult for her."[218] According to Ms. Black, before Ms. Green's alleged disability, Ms. Green "[u]sed to go [c]amping, [s]hopping without cane or use of wheelchair[.]"[219] "Side sleeping is difficult for her."[220]

---

[212] AR 108.

[213] AR 109.

[214] *Id.*

[215] AR 319–27.

[216] AR 319.

[217] *Id.*

[218] AR 320.

[219] *Id.*

[220] *Id.*

In terms of personal care, Ms. Green dressed "slowly" because "bending [is] difficult."[221] Ms. Black reported that, to her knowledge, Ms. Green had no problem bathing, caring for her hair, shaving, feeding herself, or using the toilet.[222] Ms. Green was able to prepare simple meals for herself, such as "[s]andwiches, frozen dinners[,]" during "half the week — 2–3 times a week."[223] But in preparing meals, Ms. Black reported, it was "[h]ard for [Ms. Green] to stand. She does not have the energy."[224]

In regard to Ms. Green's house and yard work, Ms. Black reported that "[s]weeping and mopping is not ideal for her. Laundry [is] okay" but Ms. Green needed help "lifting clothes from point A to point B."[225] Ms. Black estimated that Ms. Green did chores approximately "once or twice a week."[226] When not in pain, "[Ms. Green] will do what she can."[227]

Ms. Black further reported that Ms. Green was able to go outside "daily[,]" alone, and travels by car.[228] Ms. Green shopped for "food, clothes . . . depend[ing] on her pain level."[229] She was also able to pay bills, count change, handle a savings account, and use a checkbook or money orders.[230] According to Ms. Black, Ms. Green's hobbies included "[w]atching TV, playing video games, [w]atching [m]ovies" and "anything that involves cats."[231] In addition, about "2–3 times a week" Ms. Green would "chat on [com]puter, chat on phone, [and do g]eneral outings[.]"[232] Ms. Black also reported that Ms. Green went to Ms. Black's house and Ms. Green's parents' house on

---

[221] Id.

[222] Id.

[223] AR 321.

[224] Id.

[225] Id.

[226] Id.

[227] AR 322.

[228] Id.

[229] Id.

[230] Id.

[231] AR 323.

[232] Id.

a regular basis.[233] Ms. Black reported changes to Ms. Green's "[w]alking with friends at park, mall [and] [g]oing [b]owling" since the onset of Ms. Green's conditions.[234]

Ms. Black further reported that Ms. Green's conditions affected the following activities: lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing.[235] Ms. Black elaborated as follows: "squatting = difficult, walking = only less a block length[,] kneeling = is out!, stair climbing not as easy has to stop after the 2nd or 3rd step."[236] Ms. Green could walk "half a block" before needing a "5–10 min." rest.[237] Ms. Black also reported that Ms. Green could follow written instructions and "take[s] notes with spoken instructions if it details more than three things."[238] It was "[n]ot a problem" for Ms. Green to deal with authority figures.[239] Ms. Green's ability to handle stress was "less than average[,]" and her ability to handle changes in her routine was "[a]verage[.]"[240]

Ms. Black reported that Ms. Green was prescribed a cane "[s]ometime in 2012" and "she just got" a walker.[241] Ms. Black further indicated that Ms. Green needed aid "walking, getting out of car and getting out of a chair."[242]

### 2.3    Ms. Green's Testimony

In regard to her work history, Ms. Green testified that, at the time of the hearing, she worked from her San Jose home as a patient scheduler for a doctor in Burlingame.[243] She did that job

---

[233] *Id.*

[234] AR 324.

[235] *Id.*

[236] *Id.*

[237] *Id.*

[238] *Id.*

[239] AR 325.

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] AR 36.

because she "ha[d] no other income coming in."[244] Ms. Green added that she "cannot do any job where [she is] going to be standing or sitting for long periods of time."[245]

That job entailed scheduling appointments with patients, ordering prescriptions, and answering office phones.[246] Beginning June 6, 2016 through at least November 16, 2016, Ms. Green worked in that capacity full-time — eight hours per day, five days per week, "or more if needed, depending on [the doctor's] patient load" — and earned $11 per hour.[247] She previously worked in that capacity part-time, from November 11, 2014 through June 6, 2016, and earned $10 per hour.[248]

Before she worked as a patient scheduler, Ms. Green worked as a lunch assistant at Stratford School, a private elementary school, for approximately four and one-half years, ending in or around February 2013.[249] At that job, Ms. Green distributed lunches and monitored children on the playground.[250]

Ms. Green completed two years of junior college.[251] She had a driver's license, could operate a vehicle, and knew how to use a computer.[252]

In regard to her hip pain, Ms. Green testified that if she was on her feet for too long, she tended to feel pain on her "left side and sometimes it sho[t] down."[253] She could walk only short distances and had to keep moving so that her leg did not get stiff.[254] She "kind of wobble[d] side to side because [she could not] walk normally and it just tend[ed] to take a lot of energy out of

---

[244] Id.

[245] Id.

[246] Id.

[247] Id.

[248] AR 36–37.

[249] AR 39–40.

[250] AR 329.

[251] AR 38.

[252] AR 38–39.

[253] AR 47.

[254] Id.

[her].”[255] She testified that she could walk unassisted, at most, for one block.[256] She used her walker when she was in pain and felt like she was going to collapse.[257] Ms. Green testified that she also started to use two walking canes approximately one to two years before the hearing because they provided more stability.[258] She testified that she could stand for "about 15 minutes" before she would begin to feel pain and have to sit down.[259] She also testified that, after sitting for long periods of time, "the pain [would] start shooting in [her] lower back" and she tended to move to relieve the pain.[260] Ms. Green further testified that elevating her legs alleviated pain in her hip and swelling in her feet.[261]

At the time of the hearing, Ms. Green was on a one-year waiting list for hip surgery.[262] She testified that she had to "hold off" on her hip surgery until she had gastric-bypass surgery, which she "ha[d] been trying to do for the last few years[.]"[263] She testified that her gastric-bypass surgery was scheduled to take place the week following the hearing.[264] Ms. Green estimated that her hip surgery would take place approximately six months after her gastric-bypass surgery.[265]

The ALJ asked Ms. Green how she had been dealing with her limitations since she started working full-time as a patient scheduler.[266] She testified that she would "kind of forget about what's around [her]" and "forget sometimes to stand."[267] After sitting for about one hour, it was

---

[255] Id.

[256] AR 47–48.

[257] AR 48.

[258] Id.

[259] Id.

[260] Id.

[261] AR 61–62.

[262] AR 42–43.

[263] AR 43.

[264] Id.

[265] Id.

[266] AR 49.

[267] Id.

very hard for her to stand because of her hip and knees.[268] She would get up and walk around for approximately ten to fifteen minutes after sitting for "[m]aybe an hour or two."[269] She also testified that she could safely lift "under ten pounds[,]" but if the weight was any heavier, her back "lets [her] know about it[.]"[270]  She stated that she had degenerative disc disease in her lower back.[271]

Ms. Green testified that arthritis in her hands also prohibited her from lifting "if it's too heavy" but she did not have radiographic imaging of her hands.[272]

The ALJ then asked Ms. Green about her issues with incontinence.[273] In or around February 2013, Ms. Green had to wear "protection" for her incontinence and she sometimes did not make it to the bathroom in time.[274] It also caused her to get up approximately six to seven times each night, which obstructed her sleep.[275] She testified that she was "always tired" due to her incontinence and sleep apnea.[276] After her surgery to place a sacral-nerve stimulator, Ms. Green's incontinence "reduced considerably."[277] Ms. Green's issue with leakage resolved "[s]omewhat, but not completely" and it was better than it was before that surgery.[278] For the leakage, Ms. Green used pads and changed those throughout the day.[279]

---

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] *Id.*

[272] AR 49–50.

[273] AR 50.

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] AR 52.

[278] *Id.*

[279] AR 52–53.

When asked by her attorney what would make it difficult for her to continue her full-time job as a patient scheduler, Ms. Green testified that she would have issues with her back and hip.[280] She further testified that she dealt with her pain at her full-time job because she "[could not] afford not to work."[281]

### 2.4 Vocational Expert Testimony

Vocational Expert Ronald Morrell testified before the ALJ on November 16, 2016.[282] He identified Ms. Green's current work as that of an appointment clerk (DOT #237.367–010), and her past work as that of a receptionist (DOT #237.367–038).[283]

The ALJ asked VE Morrell whether an individual of Ms. Green's age, education, and vocational history could perform any of her past work if that person had the following limitations: (1) occasionally capable of lifting and carrying twenty pounds and frequently capable of lifting and carrying twenty pounds; (2) standing and walking two hours per eight-hour workday; (3) sitting six hours per eight-hour workday; (4) never using ladders, scaffolds, or ropes; (5) capable of reaching, handling and fingering bilaterally; (6) no limitations in hearing, seeing, or speaking; (7) and no environmental limitations.[284] VE Morrell testified that Ms. Green could not perform work as a teacher aide or in food service but she could perform receptionist and/or appointment clerk jobs.[285] He further testified that the use of a walker or two walking sticks would not affect the ability of an individual to perform the sedentary jobs mentioned above.[286]

VE Morrell then considered whether an individual could perform such work with the added limitation of needing to take breaks every hour for ten to fifteen minutes.[287] He testified there be

---

[280] AR 53–54. Ms. Green also testified that she had tendinitis and carpal tunnel in both arms and hands, but there is no recent evidence of those issues in the record. *Id.*

[281] AR 62.

[282] AR 38.

[283] AR 38, 40.

[284] AR 55.

[285] AR 56.

[286] AR 58.

[287] AR 57–58.

no work for such an individual.[288] VE Morrell testified that there was work in the national economy for an individual "off task" approximately fifteen percent of the workday due to pain or other symptoms, but no work for an individual "off task" more than 15 percent during the workday.[289]

VE Morrell then considered whether an individual's need to elevate her legs while sitting to hip level approximately fifty percent of the time would affect that person's ability to work.[290] VE Morrell testified that there would be no work available to such a person.[291]

### 2.5 Medical Expert Testimony

Medical Expert Subramaniam Krishnamurthi, M.D. testified before the ALJ on November 16, 2016.[292] He testified that, based on his review of Ms. Green's medical records and his medical training and experience, Ms. Green's impairments did not meet or equal any listing of the Commissioner either individually or in combination.[293] Dr. Krishnamurthi testified that regarding Ms. Green's arthritis of the left hip, she maintained RFC to "lift frequently 10 pounds, occasionally 20 pounds, and sit six out of eight-hour period, stand and walk together total two out of eight-hour period."[294] Dr. Krishnamurthi testified that Ms. Green could frequently use her hands, including reaching, handling, fingering, feeling, and grasp bilaterally.[295] Also according to Dr. Krishnamurthi, Ms. Green could never use ladders, scaffolds, or ropes but could occasionally bend, stoop, kneel, and crouch.[296] Ms. Green had no environmental limitations but had high blood pressure and diabetes.[297]

---

[288] AR 58.

[289] Id.

[290] AR 59–60.

[291] AR 60.

[292] AR 41.

[293] Id.

[294] Id.

[295] AR 42.

[296] Id.

[297] Id.

### 2.6 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Ms. Green was disabled and concluded that she was not.[298]

At step one, the ALJ found that Ms. Green engaged in substantial gainful activity for the time period of June 6, 2016 through November 16, 2016 (the date of the hearing).[299] In so holding, the ALJ explained that Ms. Green reported "working on a 'full-time' basis, 8 hours a day, 8 days a week, or even more if the doctor needs it, as a medical appointment scheduler."[300] For the time period from January 9, 2013 through June 6, 2016, the ALJ found that Ms. Green did not engage in substantial gainful activity.[301] The ALJ's remaining findings addressed the time period when Ms. Green was not engaged in substantial gainful activity.[302]

At step two, the ALJ found that Ms. Green had the following severe impairments: left-hip pain associated with degenerative change in the sacroiliac ("SI") joint in combination with obesity but without end organ damage, such as diabetic nephropathy, congestive heart failure, or chronic kidney disease; diabetes "without mention of complication and not stated as uncontrolled;" hypertension; non-durational colitis by history; sleep apnea and not tolerant of CPAP but with benefit from BiPAP; incontinence but improved with nerve generator implant; and non-durational back pain or sciatica and without x-ray findings.[303] Due to a lack of objective medical signs and laboratory findings, the ALJ found that all other conditions mentioned in the record — such as Ms. Green's "mild" carpal tunnel syndrome, asthma, and depression — were "non-severe" impairments for purposes of the decision.[304]

---

[298] AR 16–26.

[299] AR 17.

[300] *Id.*

[301] AR 17–18.

[302] AR 18.

[303] *Id.*

[304] AR 18–19.

At step three, the ALJ found that Ms. Green did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the listed impairments.[305] The ALJ explained that the record "does not document clinical signs or findings to show durational inability to use the limbs effectively or of marked gait dysfunction."[306] In addition, Ms. Green's activities of daily living, including sustained part-time work in 2013 through 2015 and full-time work in 2016, demonstrated that Ms. Green "is at least relatively functional using her cane or two canes[.]"[307] The ALJ further explained that there is no specific listing for obesity, and there is no evidence of end organ damage such as diabetic nephropathy, congestive heart failure, or chronic kidney disease.[308]

Before considering the fourth step, the ALJ determined that Ms. Green had the residual functional capacity to perform light work, except that she could only stand and walk for two hours cumulatively in an eight-hour workday.[309] In addition, Ms. Green should never climb ladders, ropes, or scaffolding, and only occasionally should climb stairs or ramps, or balance, stoop, kneel, crouch, or crawl.[310] In making this determination, the ALJ afforded significant weight to the impartial medical expert, who concluded that Ms. Green only used a cane and walker intermittently and on many different examinations, her gait was reported to be "grossly within normal limits."[311] The impartial medical expert further testified that, according to the record, Ms. Green's implanted device had improved her urinary incontinence control and did not support the degree of limitation as alleged by Ms. Green.[312]

---

[305] AR 22.

[306] *Id.*

[307] *Id.*

[308] *Id.*

[309] *Id.*

[310] *Id.*

[311] *Id.*

[312] AR 22–23.

The ALJ rejected the forms and letters submitted by Ms. Green's treating physician Dr. Tsai because Dr. Tsai's fill-in form purportedly did not include correlation with laboratory findings or examination findings, nor did it include medical foundation for the "assessment of extreme limitations [] as [Ms. Green] was admittedly working part-time at the time of this form, for years, then changed to full-time work in June 2016."[313] In addition, the ALJ explained, Dr. Tsai's form cited a "vague and inappropriate" onset date for Ms. Green's alleged "bedridden debilitation" as "2 years ago[,]" which would have predated Ms. Green's alleged onset date by more than one full year.[314] The ALJ said that Dr. Tsai's second letter cited worsening pathology for Ms. Green's left hip but provided no updated radiographic findings.[315] The ALJ explained that, although Ms. Green reported being on "waiting lists" for total hip-replacement and gastric-bypass surgeries, he found no corroborative pre-surgical examinations or plans.[316] Rather, the ALJ noted, Ms. Green missed mandatory pre-surgical appointments.[317] For these reasons, the ALJ accorded no significant weight to the "morbidly less than sedentary assessments" in Dr. Tsai's fill-in form and letter.[318]

To make this RFC finding, the ALJ followed a two-step process to determine (1) whether there were underlying medically determinable physical or mental impairments that could reasonably be expected to produce Ms. Green's pain or other symptoms, and (2) the extent to which the impairments limited Ms. Green's functioning.[319] For this purpose, if statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider other evidence in the record to determine whether Ms. Green's symptoms limit her ability to do work-related activities.[320]

---

[313] AR 23.

[314] Id.

[315] Id.

[316] Id.

[317] Id.

[318] Id.

[319] AR 24.

[320] Id.

The ALJ considered multiple credibility factors, including the following: (1) Ms. Green's intermittent complaints; (2) the purported lack of corroborative clinical findings; (3) the purported absence of corroborative diagnostic findings; (4) Ms. Green's disability-seeking behaviors; and (4) her receipt of routine and conservative treatments.[321]

The ALJ considered that although she alleged January 9, 2013 as her disability onset date, Ms. Green continued to work on at least a part-time basis of more than twenty hours per week throughout "virtually all relevant periods."[322] Further, the sustained part-time work did not include Ms. Green's eight to ten hours of nanny duties each week.[323] The ALJ considered Ms. Green's testimony that she could walk only "for a very short distance, perhaps 1 block" and that she could sit only "for about 1–2 hours and needs to change positions."[324] Ms. Green testified that, at the time of the hearing, she was on a liquid-only diet in anticipation of gastric-bypass surgery and felt weak and sleepy, so she slept through her alarm.[325] She used pads for her urinary incontinence, said that she had tendonitis and carpal tunnel syndrome, diabetes, and high blood pressure, and reported left-hip arthritis and her need to have her right hip replaced.[326]

The ALJ considered the purportedly inconsistent reports regarding Ms. Green's hip impairments.[327] The evidence indicated that Ms. Green had been assessed with left-hip osteoarthritis, or without recent x-rays, "generalized osteoarthritis[.]"[328] But, the ALJ noted, Ms. Green was reported to have "likely" tendonitis or bursitis or possibly diabetic neuropathy, which would be unrelated to arthritis.[329] Furthermore, although Ms. Green cited a "radiology report" as

---

[321] AR 24–26.

[322] AR 24.

[323] *Id.*

[324] *Id.*

[325] *Id.*

[326] *Id.*

[327] AR 24–25.

[328] AR 24.

[329] *Id.*

evidence of her hip impairments, the report showed only a "grossly normal" chest x-ray.[330] The ALJ found no x-rays in the record showing moderate to severe osteoarthritis and identified only a 2015 finding regarding a "suboptimal visual[]" on a left-hip x-ray, in which the radiologist purportedly agreed with a prior impression of osteoarthritis.[331] The ALJ concluded that there was "only a solitary finding of 'degenerative changes' of the SI joints but with normal sacrum and otherwise normal tailbone."[332] Even accepting as accurate reports of "moderate to severe" left-hip osteoarthritis, without any MRI report, the ALJ questioned Ms. Green's testimony regarding needing total hip replacement "without such usual diagnostic findings" in cases like "*end stage* arthritis or necrosis."[333] The ALJ considered information in the record indicating that, as of June 22, 2015, Ms. Green stopped working due to right-hip pain, but noted that Ms. Green repeatedly reported left-hip pain and that she was in fact working in 2015.[334]

In regard to Ms. Green's claim of severe diabetes, the ALJ found there was no evidence of diabetic retinopathy or diabetic peripheral neuropathy, but rather found her diabetes had been described as "without mention of complications and not stated as uncontrolled[.]"[335] She was, admittedly, "still drinking soda[.]"[336] The ALJ further considered the fact that medical treatment such as Ms. Green's sacral-nerve implant had improved her urinary incontinence symptoms.[337] Moreover, although Ms. Green testified that she could not do any job involving sitting or standing, the ALJ found that she contradicted herself by performing her current job in that fashion, as she sustained that work for years on a part-time basis and since June 2016 on a full-time basis.[338] Ms.

---

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] AR 24–25.

[334] AR 25.

[335] *Id.*

[336] *Id.*

[337] *Id.*

[338] *Id.*

Green claimed that she worked only twenty-five hours per week in 2014 through June 2016, but the ALJ found no medical explanation in the record to medically support a finding that Ms. Green was limited to working only twenty-five hours per week during that time.[339] In addition, Ms. Green admitted to an additional eight to ten hours of work each week as a nanny during that time period.[340]

In regard to her mental health, Ms. Green reported that she had suffered severe depression for 20 years.[341] The ALJ determined, however, that the record documents no psychiatric or psychotherapy treatment, and the consultative psychiatrist found no significant mental limitations based on her full status evaluation and interview.[342] Although the record suggested that Ms. Green experienced some degree of over-sedation, Ms. Green admitted to making that realization herself and adjusting her medication accordingly.[343]

Finally, the ALJ considered a third-party function report submitted by Ms. Green's friend of fourteen years, Andrea Black. The ALJ found that the form "essentially repeat[ed] the claimant's own subjective complaints[,]" such as Ms. Green's inability to walk or shop.[344] Ms. Black reported, however, that Ms. Green engaged in "relatively full activities of daily living and social functioning[,]" including the ability to self-groom, leave the house daily, drive a car, prepare simple meals, shop in public, pay bills and handle bank accounts, watch TV, and take care of pets, amongst other activities.[345]

After considering the evidence, the ALJ determined that Ms. Green's impairments could reasonably be expected to cause the alleged symptoms.[346] But her statements concerning the

---

[339] *Id.*

[340] *Id.*

[341] *Id.*

[342] *Id.*

[343] *Id.*

[344] *Id.*

[345] AR 25–26.

[346] AR 26.

intensity, persistence and limiting effects of those symptoms were not entirely consistent with the evidence in the record.[347]

As to step four, the ALJ determined that Ms. Green was capable of performing past relevant work as an appointment clerk/receptionist and an administrative receptionist.[348] Such work, the ALJ explained, does not require the performance of work-related activities precluded by Ms. Green's RFC.[349] In so holding, the ALJ relied upon the vocational expert's opinion that Ms. Green's self-reported use of two canes would not preclude her ability to function successfully at these jobs.[350] Additionally, the ALJ found that Ms. Green could elevate her legs appropriately at such jobs in the outside workforce, as she reports doing at home.[351]

In comparing Ms. Green's RFC with the physical and mental demands of such work, the ALJ found that Ms. Green could perform such work.[352] The ALJ thus found Ms. Green "not disabled" at the fourth step of the analysis.[353] Accordingly, the ALJ held that Ms. Green had not been under a disability during the relevant time period and denied Ms. Green SSDI and SSI benefits.[354]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it

---

[347] *Id.*
[348] *Id.*
[349] *Id.*
[350] *Id.*
[351] *Id.*
[352] *Id.*
[353] *Id.*
[354] *Id.*

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

Ms. Green contends that the ALJ erred by (1) rejecting the opinions of Ms. Green's treating and examining doctors, (2) rejecting Ms. Green's testimony, (3) rejecting lay-witness testimony, and (4) determining that Ms. Green could perform relevant past work.[355]

### 1. Whether the ALJ Properly Weighed Medical-Opinion Evidence

Ms. Green argues that the ALJ erred because he improperly weighed the medical-opinion evidence.[356] The court agrees with Ms. Green.[357] The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

---

[355] Mot. – ECF No. 28 at 6.

[356] Mot. – ECF No. 28 at 16–18.

[357] The court agrees with Ms. Green as to the ALJ's improper weighing of treating physician Dr. Tsai's assessments. To the extent Ms. Green asserts that the ALJ should have credited the "supporting opinions" from Timothy Ong, M.D., and Victoria Chen, M.D. (Mot. – ECF No. 28 at 14), those two doctors did not provide any opinion regarding Ms. Green's functional limitations, but rather examined her once and twice, respectively, mostly before the alleged onset date. *See* AR 802–06, 811–15, 819–22.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."[358] *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by

---

[358] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, November 16, 2016.

United States District Court
Northern District of California

providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). "Other sources" include nurse practitioners, physicians' assistants, therapists, teachers, social workers, spouses, and other non-medical sources. 20 C.F.R. § 404.1513(a). The ALJ is required to consider observations by "other sources" as to how an impairment affects a claimant's ability to work, *id.*; nonetheless, an "ALJ may discount the testimony" or an opinion "from these other sources if the ALJ gives . . . germane [reasons] . . . for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted).

The ALJ rejected treating physician Dr. Tsai's RFC assessment wholesale, finding it inconsistent with other evidence in the record.[359] He explained as follows:

> In this case, the record includes [] a fill-in form submitted and added to the record *twice*, at Ex. 2F and Ex. 11F. Neither is accorded any significant weight because it includes no correlation with laboratory findings or examination findings in treatment notes. Therefore, there is no medical foundation offered for the assessment of extreme limitations even as the claimant was admittedly working part-time at the time of this form, for years, and then changed to full-time work in June 2016. Further the form cites a vague and inappropriate onset date by more than a full year [sic]. The later letter submitted by Dr. Tsai is not much better in that it cites worsening pathology for the claimant's left hip but provides no updated radiograph findings.[360]
> . . . While it is true, that the claimant reports being on "waiting lists" for total hip replacement and gastric-bypass surgeries, the undersigned finds no corroborate pre-surgical examinations or plans. . . . For these reasons, the undersigned rejects and accords no significant weight to the morbidly less than sedentary assessments in the fill-in forms and letters submitted by Dr. Tsai.[361]

The ALJ's first reason for rejecting Dr. Tsai's opinion — that it "includes no correlation with laboratory findings or examination findings" — does not constitute a specific and legitimate reason to discount Dr. Tsai's RFC assessment because it is inaccurate. Contrary to the ALJ's assertion, the record includes multiple hip x-rays showing moderate to severe hip degeneration. Although the ALJ correctly points out that a June 22, 2015 x-ray of Ms. Green's left hip was inconclusive due to "suboptimal visualization[,]"[362] at least two other x-ray images support Dr. Tsai's assessment and treatment regarding Ms. Green's hip conditions.[363] First, a December 18, 2013 left-hip x-ray shows "moderate to severe degenerative changes of the left hip joint[.]"[364] Second, a December 15, 2014 x-ray — taken one month before Dr. Tsai's RFC letter — shows "[m]oderate to marked apparent degenerative change at the left hip[.]"[365] The ALJ erred by not

---

[359] AR 22–23.

[360] AR 23.

[361] *Id.*

[362] AR 1152.

[363] *See* AR 775, 1147–48.

[364] AR 775.

[365] AR 1147–48.

evaluating this evidence. "[C]arefully search[ing] the record" and not finding significant medical evidence is not a specific and legitimate reason for discounting a medical opinion.[366] *See Garrison*, 759 F.3d at 1012–13 ("an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it").

The ALJ also erred by discounting Dr. Tsai's assessment on account of her supposedly "conservative" treatment.[367] Dr. Tsai attempted to treat Ms. Green's hip pain with steroid injections,[368] which were ineffective,[369] as well as physical therapy.[370] But these treatments did not result in "significant improvement."[371] Dr. Tsai's treatment notes document worsening pain, more frequent falls, and a decreased ability to stand and walk.[372] "Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated." *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017). Ms. Green received multiple hip injections[373] and was prescribed a variety of medications for her pain, including Vicodin and Codeine.[374] She also attended at least seven physical therapy sessions,[375] during which she was "teary eyed/crying [] regarding her hip pain[.]"[376] The ALJ provided no explanation why he deemed this treatment "conservative" for Ms. Green's hip osteoarthritis. *See id.* (doubting that "epidural steroid shots . . . qualify as 'conservative medical treatment.'") (quoting *Garrison*, 759 F.3d at 1015 n.20).

---

[366] AR 21.

[367] AR 23.

[368] *See* AR 538, 589–90, 1003, 1017, 1023.

[369] *See* AR 603 ("Injection into greater trochanter didn't help."); *see also* AR 1003 ("[I]njections into bursitis by GP not helpful already on waitlist").

[370] AR 701–19.

[371] AR 1017.

[372] *See* AR 567, 953, 955, 1003, 1017, 1024.

[373] *See* AR 538, 589–90, 1003, 1017, 1023.

[374] *See* AR 664.

[375] *See* AR 697–720, 965–77.

[376] AR 719.

The ALJ's second reason for rejecting Dr. Tsai's opinion — that there is no evidence to corroborate Ms. Green's being on waiting lists for hip-replacement and gastric-bypass surgeries — also does not constitute a specific and legitimate reason to reject Dr. Tsai's RFC assessment because it is inaccurate. As the record reflects, Ms. Green was indeed evaluated for both hip-replacement[377] and gastric-bypass surgeries.[378] Although Ms. Green missed one mandatory appointment for gastric-bypass surgery,[379] as the ALJ acknowledges,[380] she later satisfied that prerequisite.[381] Ms. Green also testified at the November 16, 2016 hearing that she was scheduled for gastric-bypass surgery that very next week and her hip-replacement surgery would likely take place six months after that.[382]

Notably, it appears that the ALJ failed to consider the length of Dr. Tsai's treatment of Ms. Green, instead reducing Dr. Tsai's extensive treatment history to "fill-in form" testimony.[383] Dr. Tsai saw Ms. Green in connection with her hip pain and other ailments at least fifteen times between March 20, 2013 and May 17, 2016.[384] *See* 20 C.F.R. § 404.1527(c)(1)–(2), (f) (explaining that an opinion from a source who has examined the claimant and had a longer treatment relationship should generally be given greater weight). She consistently saw Ms. Green during her pain treatment and received reports from specialists.[385] *See id.* § 404.1527(c)(2)(ii) (in determining the weight that should be given to an opinion, the ALJ should look at "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed or

---

[377] *See, e.g.,* AR 1023 ("She has tried multiple other therapies for the hip and has been evaluated by orthopedic surgery and she is currently on waitlist for hip replacement."); *see also* AR 709, 847.

[378] *See* AR 1003.

[379] AR 709.

[380] AR 23.

[381] *See* AR 838 ("[Ms. Green] went to Sept 2nd orientation for gastric bypass.").

[382] AR 43.

[383] AR 23.

[384] *See* AR 514–17, 520–27, 565–68, 588–91, 600–04, 611–20, 831–35 (duplicate December 17, 2013 report), 844–47, 851–54, 865–67, 869–75, 879–82, 933, 936–42, 1025–28, 1032–35, 1059–62, 1069–72.

[385] *See, e.g.,* 831.

ordered from specialists"). The fill-in form was one of Dr. Tsai's many assessments indicating severe restrictions on Ms. Green's abilities.[386] *Cf. Trevizo v. Berryhill*, 871 F.3d 664, 677 n.4 (9th Cir. 2017) ("[T]he ALJ was not entitled to reject the responses of a treating physician without specific and legitimate reasons for doing so, even where those responses were provided on a 'check-the-box' form, were not accompanied by comments, and did not indicate to the ALJ the basis for the physician's answers.").

In sum, the ALJ erred by failing to: (1) give specific and legitimate reasons for rejecting Dr. Tsai's opinions; and (2) consider those opinions in the context of the totality of the medical evidence, including Dr. Tsai's extensive treatment history with Ms. Green. These errors require remand.

## 2. Whether the ALJ Erred by Finding Ms. Green's Reports of Her Own Symptoms Not Credible

Ms. Green contends that the ALJ erroneously discredited her testimony.[387] In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between

---

[386] *See, e.g.*, AR 524, 565–67, 600, 603, 844, 865–72.

[387] Mot. – ECF No. 28 at 14–17.

testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester*, 81 F.3d at 834) ; *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found the following about Ms. Green's testimony:

> While the claimant testified that she was working at home because she had no other income (than from working), the undersigned observes that many people work for the same reason. Further, when the claimant insists that she cannot do any other job involving sitting or standing, she is in fact contradicting herself by being able to perform her current job in that fashion, sustaining that work for years on a part-time basis and since June 2016 on a full-time basis. The undersigned appreciates the claimant's unconfirmed report that in 2014 until June 2016, she was only working 25 hours a week. However, the undersigned cannot find a medical explanation in the record to medically support a finding that the claimant was limited to working only 25 hours a week during that time. In fact, the claimant even admitted to additional work as a nanny and during every week in addition to those 20-something hours each week.[388]

As discussed above, the ALJ failed to properly consider the full laboratory and examination findings submitted in support of Ms. Green's allegations — including reports of her hip x-rays and Dr. Tsai's treatment relationship with Ms. Green. *See* 20 C.F.R. § 404.1529(c)(1)–(2) (explaining that the ALJ considers "all of the available evidence from [claimant's] medical sources and nonmedical sources" and objective medical evidence).

Because the ALJ discredited Ms. Green's testimony in part based on his assessment of the medical-opinion evidence, the court remands on this ground as well. The ALJ can reassess Ms. Green's credibility in context of the entire record.

---

[388] AR 25.

### 3. Whether the ALJ Erred by Discounting the Lay Witness Testimony

Ms. Green argues that the ALJ erred by giving minimal weight to Ms. Black's statement.[389]

The ALJ is required to consider "other source" testimony and evidence from a layperson. *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work") (internal quotation marks and citation omitted). "Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). It is competent evidence and "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). Moreover, if an ALJ decides to disregard the testimony of a lay witness, the ALJ must provide "specific" reasons that are "germane to that witness." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). The Ninth Circuit has not "required the ALJ to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. An ALJ may "point to" reasons already stated with respect to the testimony of one witness to reject similar testimony by a second witness. *Id.*

The ALJ found the following regarding Ms. Black's testimony:

> The record includes a third party function report submitted by a friend of the claimant for 14 years. The form begins by essentially repeating the claimant's own subjective complaints such as that she was unable to walk a block and unable to shop at Ikea. However, the claimant's longtime friend reports relatively full activities of daily living and social functioning for the claimant including that she was able to self-groom, leave the house daily, drive a car, prepare simple meals, shop in public, pay bills and handle bank accounts, watch TV, play video games, watch movies, take care of cats, chat on the phone, log onto the computer, and go to her parents' house (Ex. 6E). The undersigned has carefully and fully considered the totality of this lay third party form but has accorded it no more than its appropriate, minimal, weight.[390]

---

[389] Mot. – ECF No. 28 at 21–23.

[390] AR 25–26.

As discussed above, the ALJ's reasons for rejecting Ms. Green's own complaints were improper. The ALJ found Ms. Green's allegations inconsistent with the medical record, in large part, because the ALJ did not review all relevant medical evidence in the record — including x-ray reports indicating Ms. Green's worsening hip pathology.[391] The ALJ erred by doing so. For this reason, to the extent the ALJ relied on the same flawed reasoning to reject Ms. Black's statement "essentially repeating" Ms. Green's allegations, the ALJ erred by discounting Ms. Black's statement.

Furthermore, the ALJ erred by discounting Ms. Black's statement in light of Ms. Green's activity of daily living. While a claimant's daily activities may provide a legitimate basis for a finding of inconsistency with her disabling conditions, *see Orn*, 495 F.3d at 636, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent" with eligibility for disability benefits, *Garrison*, 759 F.3d at 1017. In *Garrison*, the Ninth Circuit recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," and found that "only if her level of activity were inconsistent with a claimant's claimed limitations would these activities have any bearing on her credibility." *Id.* at 1016 (quotations and citations omitted); *see also Smolen*, 80 F.3d at 1287 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits. . . .").

Finally, because the ALJ did not adequately identify which of Ms. Black's statements he discredited, it is not clear whether his reasons for discrediting Ms. Black's statements are germane. Given these circumstances, the court finds that the ALJ erred by not providing "specific" reasons that are germane to Ms. Black's statement. *See Nguyen*, 100 F.3d at 1467.

### 4. Whether the ALJ Erred by Finding that Ms. Green Could Return to Her Past Relevant Work

Ms. Green argues that the ALJ erred by finding that she could return to her past relevant work.

---

[391] *See* AR 775, 1147–48.

"[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r of Social Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015); *see also Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity"). The ALJ's determination of a claimant's RFC must be based on the medical opinions and the totality of the record. 20 C.F.R. §§ 404.1527(d), 404.1546(c). Moreover, the ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison*, 759 F.3d at 1010 (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn*, 495 F.3d at 630 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

After considering only part of the relevant evidence in the record, the ALJ found that Ms. Green had the RFC to perform "light work"[392] and that she could return to her past relevant work as an appointment clerk or administrative assistant.[393] In so finding, however, the ALJ failed to consider all medical evidence and the VE's testimony in its totality. Specifically, as discussed above, the ALJ erroneously discredited treating physician Dr. Tsai's RFC assessment when he overlooked x-ray reports supporting Ms. Green's allegations and failed to consider Dr. Tsai's extensive treatment relationship with Ms. Green, documenting worsening hip pathology over time.[394]

In addition, the ALJ credited the VE's initial conclusion that Ms. Green's use of two canes would not preclude her ability to function successfully at these jobs and that she could elevate her legs "appropriately" at such a job in the outside workforce as she reported doing at home.[395] But

---

[392] AR 22–26.

[393] AR 26.

[394] *See* AR 567, 953, 955, 1003, 1017, 1024.

[395] AR 26.

he failed to consider the VE's testimony that no work would be available to Ms. Green if she needed to elevate her legs to hip level for approximately fifty percent of the workday, as Dr. Tsai opined.[396]

After considering all the relevant evidence excluded from the initial ALJ decision, the ALJ may very well come to the same conclusion. Ms. Green is, however, entitled to fair consideration by the ALJ.

## CONCLUSION

The court grants Ms. Green's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: October 16, 2018

_____
LAUREL BEELER
United States Magistrate Judge

---

[396] AR 59–60.